UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

JONATHAN BRADLEY,

                   Plaintiff,           04 Civ. 8411

    -against-                    OPINION

NEW YORK CITY POLICE OFFICER
ALEXIS JUSINO,

                   Defendant.

------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/4/09

A P P E A R A N C E S:

        Attorneys for Plaintiff

        JAMES I. MEYERSON, Esq.
        64 Fulton Street, Suite 502
        New York, NY  10038

        JEFFREY ROTHMAN, Esq.
        315 Broadway, Suite 200
        New York, NY  10007

        Attorneys for Defendant

        MICHAEL A. CARDOZO
        Corporation Counsel of the City of New York
        100 Church Street
        New York, NY  10007
        By:  Elizabeth M. Daitz, Esq.
            Dara L. Weiss, Esq.

**Sweet, D.J.**

Defendant New York Police Officer Alexis Jusino ("Jusino" or the "Defendant") has moved for Judgment as a Matter of Law, pursuant to Fed. R. Civ. P. 50, on the grounds that he is entitled to qualified immunity on the claim raised against him by Plaintiff Jonathan Bradley ("Bradley" or the "Plaintiff"). Plaintiff has moved for Relief and for the Entry of Judgment in Favor of Plaintiff on both his false arrest claim and qualified immunity.

This action initially appeared to be a relatively routine confrontation between a demonstrator and a police officer towards the end of an unexpectedly massive anti-war demonstration. However, the circumstances were unfamiliar to both Bradley, a 63-year old self-styled farmer from outside Ithaca, and Jusino, a very recent graduate of the Police Academy. Under these circumstances, difficulties in managing and presenting a qualified immunity defense in a false arrest case became manifest. The regrettable procedural tangle and ultimate resolution is described below.

For the reasons set forth below, Plaintiff's
motion is granted, and Defendant's motion is denied.

## I.  **Prior Proceedings**

On October 26, 2004, Bradley filed a complaint
asserting several claims under the Fourth Amendment in
connection with Bradley's arrest on March 22, 2003, against
the City of New York, various supervisory officers in the
New York Police Department ("NYPD"), and Jusino.

In an opinion dated January 25, 2007, this Court
adopted in its entirety the Report and Recommendation of
Magistrate Judge Michael H. Dolinger denying Plaintiff's
motion for summary judgment, and denying in part
Defendant's motion for summary judgment. See Bradley v.
Jusino, No. 04 Civ. 8411 (RWS), 2007 WL 232945 (S.D.N.Y.
Jan. 26, 2007).

From January 29 to February 9, 2007, trial was
held before a jury on Plaintiff's unlawful arrest,
excessive force, and malicious prosecution claims.  On
February 9, 2007, the jury returned a special verdict, upon
which a judgment was entered on February 20, 2007.  The

2

special verdict reflected the jury's affirmative answers to
Questions 1 and 2 of the Special Verdict Form. Question 1
asked whether Jusino arrested Bradley without probable
cause, while Question 2 asked whether Jusino was entitled
to qualified immunity.

On March 5, 2007, Plaintiff moved to set aside
the jury's verdict granting Jusino qualified immunity with
respect to the false arrest claim or, in the alternative,
for a new trial on that claim. In an opinion dated
February 12, 2008, the Court granted in part Plaintiff's
motion, ordering a re-trial of both the qualified immunity
defense and Plaintiff's false arrest claim against Jusino.
See Bradley v. Jusino, 2008 WL 417753 (S.D.N.Y. Feb. 14,
2008) ("February 12, 2008 Opinion").[1]  The Court held that
it had erred in submitting the question of qualified
immunity to the jury, and because of a "high likelihood of
confusion" and the risk that the jury's verdict on
Plaintiff's false arrest claim was affected by its

---

[1] The Court also found that, at that time, "judgment as a matter of law
pursuant to Fed. R. Civ. P. 50 regarding Jusino's qualified immunity
defense is not appropriate." February 12, 2008 Opinion, at 4.

qualified immunity finding, the Court ordered a re-trial on both issues.[2] See February 12, 2008 Opinion, at 4—6.

Both Plaintiff and Defendant moved for reconsideration of the February 12, 2008 Opinion. Plaintiff's motion was denied, and Defendant's motion was granted in part, though upon reconsideration, the Court adhered to its prior ruling. See Bradley v. Jusino, No. 2008 WL 3891529 (S.D.N.Y. Aug. 19, 2008).

Plaintiff then applied for, and was denied, certification of a question to the Court of Appeals involving this Court's re-trial order. See Bradley v. Jusino, 2008 WL 4566792 (S.D.N.Y. Oct. 14, 2008).

Plaintiff's claim of false arrest was re-tried before a jury beginning February 2, 2009. On February 11, 2009, following the jury's failure to reach a unanimous verdict, the Court declared a mistrial.

On February 25, 2009, Bradley filed a Motion for Relief and for Entry of Judgment in favor of Bradley. On

---

[2] Adding to the risk is the fiction that Jusino will be liable for any damage award, when it has been established, though not on this record, that any payment will be made by the employer, the City of New York.

February 27, 2009, Defendant filed a motion for Judgment as
a Matter of Law.

Oral argument was held and both motions were
marked fully submitted on April 15, 2009.

**II.  The Facts**

The facts are drawn from the testimony offered in
the second trial,[3] and are not in dispute, except as noted
below.[4]  For the purposes of this motion, Defendant accepts
as true Plaintiff's version of the events surrounding the
arrest.

On March 22, 2003, an anti-war march and
demonstration was held in New York City starting at Times
Square and proceeding south to Washington Square Park (the
"Park").  Tr. 608.  Attendance at the march far exceeded
the number which had been anticipated.  The Park, which has
a capacity of approximately 7,000 people, served as a

---

[3] All references to "Tr." in this Opinion refer to the February 2009
trial transcript.
[4] Despite Plaintiff's arguments that the Court is precluded from relying
on the second trial record because the trial is a "nullity," Plaintiff
has conceded that "there is no relevant, material difference among any
of the three records [the pre-first trial record, the first trial
record, and the first Retrial mistrial record]."  Plaintiff Jonathan
Bradley's Oppostion to Defendant Alexis Jusino's Post First Retrial
Motion for Relief ("Pl. Opp.") at 26, n.14.

5

dispersal area for the approximately 100,000 people who had participated in the march. Tr. 611.

As the afternoon of March 22 progressed, the NYPD had an increasingly difficult time keeping the west sidewalk of Washington Square West clear for use by residents of the area, as well as for persons going to and from the commercial and university buildings across from the Park. Tr. 615—16.

At some point during the afternoon, an incident occurred on Washington Square West near Washington Square South that necessitated the first arrests in the vicinity of the Park that afternoon. Tr. 616. Following the incident, the situation in the Park became "tense" as demonstrators began throwing sticks, water bottles, and bricks at the police officers. Tr. 616—17.

Bradley, a 63-year old resident of Brooktondale, New York, an exurb of Ithaca, and a self-described farmer, had come to New York to accompany his wife, a professor, who was attending a professional conference on March 21 and 22. Tr. 59—60, 69—70. Upon learning of the demonstration, Bradley decided to participate and joined the rear of the

6

march as it left the Times Square area.  Tr. 71, 74.  He
arrived in the vicinity of the Park at approximately 3:30
p.m.  Tr. 75—76.  Upon his arrival in the Park, Plaintiff
heard announcements over a loudspeaker stating that "the
march is now over," and instructing participants to "clear
the area as soon as possible."  Tr. 76.

Once he reached the perimeter of the Park, in
company with other marchers as directed, Bradley proceeded
west on Washington Square North and then south on
Washington Square West as far south as Washington Place.
Tr. 79.  At Washington Place, he was stopped by a police
line.  Tr. 80—81.  After observing an altercation between
the police and demonstrators involving pepper spray and
attempts by demonstrators to move police-erected
barricades, Bradley approached a sergeant and requested
permission to pass through the line.  Tr. 82—83.  The
sergeant responded that Bradley "must clear the area."  Tr.
83—84.

It was around this time that Jusino and other
officers who had formed a police line at right angles to
the line of the march were directed to move forward, or
northward, on Washington Square Park West to move the

7

participants north and out of the Park. Tr. 378—79. Jusino had graduated from the Police Academy two months earlier in January 2003. Tr. 364.

A short time after the police line began moving forward, Bradley fell to the ground. Tr. 84. A video introduced at trial, which did not capture Bradley's fall, establishes that there was attendant noise and confusion. Def. Exhibit F.

Jusino observed Bradley's fall out of the corner of his eye, although he had never encountered Bradley before and was not familiar with him until the time of his fall. Tr. 500—01. Jusino's initial assumption was that Bradley had fallen unintentionally and innocently. Tr. 501—02. Bradley was not wearing buttons and there was no indication that he was involved in the demonstration. Tr. 267—68.

Bradley stuck his hand out to block his fall, landing on his right side, and as the police line moved over him, he rolled onto his stomach, facedown on the sidewalk "so that [he] wouldn't get kicked or stepped on." Tr. 84—85. Bradley then felt himself being lifted off the

8

sidewalk before he was "dropped or slipped or fell," and ended up back on the sidewalk. Tr. 85.

According to Jusino, he grabbed Bradley and held him by his arm. Tr. 381. Jusino told Bradley, "Come on guy, get up." Id. Bradley's eyes were open. Tr. 87. According to Jusino, he did not appear sick, dazed or disoriented. Tr. 388. Bradley suffers from tinnitus and is hard of hearing. Tr. 88.

Bradley testified that at the time he was lifted from the ground, his body was "reasonably relaxed" before going "into some sort of contraction." Tr. 108. Plaintiff was then placed into a sitting position, instructed to put his hands behind his back, and was placed chest-down on the pavement and handcuffed. Tr. 88–89.

From the time of his instruction "to get up," through Bradley's handcuffing, Jusino did not say anything additional to Bradley. Tr. 521. Bradley was silent prior to being placed under arrest. Tr. 388—89.

Jusino testified that he determined that Bradley was committing an offense when he felt Bradley's body "go

9

dead." Tr. 385. Following this determination, Jusino
testified that a supervisor came up behind him, tapped him
on the shoulder, and instructed him to place Bradley under
arrest. Id. Judge Ellen Gesmer, an observer and witness
to the incident, also testified that she heard a sergeant
say to arrest Plaintiff some time after Bradley was on the
ground. Tr. 272.

Testimony from Deputy Inspector Joseph Moscatt
establishes that a large percentage of arrests made at
demonstrations involve protestors engaging in acts of civil
disobedience, constituting offenses such as disorderly
conduct or obstruction of governmental administration. Tr.
605—06. The acts that most often lead to arrests at
demonstrations for these offenses include refusing to
disperse in the face of announcements indicating that
demonstrators must move, blocking sidewalks or pedestrian
pathways, sitting down, and going limp and/or rigid. Id.
Jusino also testified that he had received training with
respect to civil disobedience. Tr. 386.

The video evidence demonstrates that from the
moment the police line started moving northward to the
point when Jusino was in the process of handcuffing Bradley

10

was a total of approximately 36 seconds.  Def. Exhibit F;
Tr. 531—32.  Between the time that Bradley fell and the
time that he ended up back on the sidewalk, approximately
ten seconds lapsed.  Tr. 85.

## III.  The Legal Standard

Defendant brought the instant motion for judgment
as a matter of law pursuant to Fed. R. Civ. P. 50.[5]  Rule 50
provides that once

> a party has been fully heard on an
> issue during a jury trial and the court
> finds that a reasonable jury would not
> have a legally sufficient evidentiary
> basis to find for the party on that
> issue, the court may:  (A) resolve the
> issue against the party; and (B) grant
> a motion for judgment as a matter of
> law against the party on a claim or
> defense that, under the controlling
> law, can be maintained or defeated only
> with a favorable finding on that issue.

---

[5] Although Defendant's motion was made pursuant to Rule 50(a), Rule
50(b) is the proper procedural vehicle for motions for judgment as a
matter of law in cases such as this where the action was submitted to a
jury, but no verdict was returned and therefore no judgment has been
entered.  See Fed. R. Civ. P. 50(b) (providing that in ruling on
renewed motion under Rule 50(a), court may "allow judgment on the
verdict, if the jury returned a verdict" or "direct the entry of
judgment as a matter of law").  However, given that "[t]he standard for
granting a renewed motion for judgment as a matter of law under Rule
50(b) is precisely the same as the standard for granting the pre-
submission motion under Rule 50(a)," the distinction is without import.
9B Charles A. Wright & Arthur R. Miller, Federal Practice and
Procedure, § 2537, at 619—20 (3d 2008).

11

Fed R. Civ. P. 50(a)(1).

A motion for judgment as a matter of law should not be granted "unless the evidence, viewed in the light most favorable to the nonmoving party, is insufficient to permit a reasonable juror to find in his favor." Arlio v. Lively, 474 F.3d 46, 51 (2d Cir. 2007) (citing Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998)). In the absence of a verdict, judgment as a matter of law is only appropriate where "there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." Advance Pharm., Inc. v. United States, 391 F.3d 377, 390 (2d Cir. 2004) (internal citation omitted) (alterations in original).

## IV. Qualified Immunity

Both parties now contend that the Court possesses sufficient undisputed facts to determine, as a matter of law, whether Jusino is entitled to qualified immunity.

Where applicable, qualified immunity protects government officials "from liability for civil damages

12

insofar as their conduct does not violate clearly
established statutory or constitutional rights of which a
reasonable person would have known." Pearson v. Callahan,
129 S. Ct. 808, 815 (2009) (internal quotation and citation
omitted).

In Saucier v. Katz, the Supreme Court established
a mandatory two-step inquiry to determine whether an
official is entitled to qualified immunity.  533 U.S. 194
(2001).  First, courts were required to answer the
threshold question of whether an official's conduct
violated a constitutional right.  Id. at 201.  If the
plaintiff satisfied the court that a constitutional
violation had occurred, only then could the court move on
to determine whether either of two conditions was
satisfied.  A defendant was entitled to qualified immunity
if either "(1) his actions did not violate clearly
established law or (2) it was objectively reasonable for
him to believe that his actions did not violate clearly
established law." Iqbal v. Hasty, 490 F.3d 143, 152 (2d
Cir. 2007).

The Supreme Court recently overruled Saucier's
"mandated two-step sequence" in favor of a more flexible

13

approach, permitting lower courts "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 129 S. Ct. at 815, 818 (2009). Based on Pearson and the flexible approach it encourages, this Court finds it appropriate to first address the second prong of the qualified immunity analysis, namely whether it was objectively reasonable for Jusino to believe that his actions did not violate clearly established law, before determining whether Jusino violated Bradley's constitutional rights.

### a. It Was Not Objectively Reasonable for Jusino to Believe He Had Probable Cause to Arrest Bradley

Plaintiff's false arrest claim alleges an illegal seizure in violation of his Fourth Amendment right. Where, as here, the statutory or constitutional right is well-established, whether qualified immunity applies to the alleged false arrest violation "turns on whether the [defendant's] probable cause determination was objectively reasonable." Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007). In this Circuit, "[a]n officer's

14

determination is objectively reasonable if there was 'arguable' probable cause at the time of arrest--that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met.'" Id. (citing Lennon v. Miller, 66 F.3d 416, 423-24 (2d Cir.1995)); see Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) ("Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." (internal quotation and citation omitted)); Cerrone v. Brown, 246 F.3d 194, 202—03 (2d Cir. 2001) ("Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law." (internal quotation and citation omitted) (emphasis in original)). Arguable probable cause, however, "should not be misunderstood to mean 'almost' probable cause." Jenkins, 478 F.3d at 87.

"Whether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact." Zellner v. Summerlin, 494 F.3d 344, 337 (2d Cir.

15

2007). "The ultimate question of whether it was
objectively reasonable for the officer to believe that his
conduct did not violate a clearly established right" is for
the court to decide. Id. Where, as here, "there is no
dispute as to the material historical facts, the matter of
whether the officer's conduct was objectively reasonable is
an issue of law to be determined by the court. Id. at 368.

As the Supreme Court has noted, qualified
immunity is designed to protect police officers who must
make "split-second judgments—in circumstances that are
tense, uncertain, and rapidly evolving." Saucier, 533 U.S.
at 205 (internal citation omitted). Accordingly, "the
analysis of a qualified immunity defense . . . entails an
inquiry into the facts known to the officer at the time of
the arrest." Zellner, 494 F.3d at 370 (internal quotation
and citation omitted).

According to Defendant, Jusino is entitled to
qualified immunity because a reasonable officer in a
similar situation could have reasonably concluded that
probable cause existed to arrest Bradley for Disorderly
Conduct and/or Obstruction of Governmental Administration.

16

Under New York Penal Law § 240.20, an individual

commits Disorderly Conduct

> when, with intent to cause public
> inconvenience, annoyance or alarm, or
> recklessly creating a risk thereof . .
> . 4.   Without lawful assembly, he
> disturbs any lawful assembly or meeting
> of persons; or 5. He obstructs
> vehicular or pedestrian traffic; or 6.
> He congregates with other persons in a
> public place and refuses to comply with
> a lawful order of the police to
> disperse; or 7. He creates a hazardous
> or physically offensive condition by
> any act which serves no legitimate
> purpose."

N.Y. Penal Law § 240.20(4)—(7) (McKinney 2009). An

individual is guilty of Obstruction of Governmental

Administration ("OGA") "when he intentionally obstructs,

impairs or perverts the administration of law or other

governmental function or prevents or attempts to prevent a

public servant from performing an official function, by

means of intimidation, physical force or interference or by

means of any independently unlawful act . . . ." N.Y.

Penal Law § 195.05 (McKinney 2009).

Jusino argues that based on Bradley's presence on

the Washington Square Park West sidewalk, and in light of

the fact that the barriers were erected to keep that

sidewalk clear of demonstrators in order to prevent the

interference with non-demonstrating pedestrian traffic, it

17

was objectively reasonable for Jusino to conclude that
Bradley was not only a participant in the demonstration, as
opposed to a resident, employee or student, but that he was
intentionally obstructing pedestrian traffic in violation
of §§ 195.05 and 240.20.

Defendant contends that a reasonable officer
could reasonably have concluded that Bradley had
participated in the march and had heard multiple orders to
disperse, orders with which he presumably had failed to
comply. Because Bradley failed to inform Jusino that he
was unable to comply with the orders to disperse,
Defendant's argument continues, a reasonably prudent
officer could have concluded that Bradley's refusal to
comply was intentional.[6]

A review of the record, however, demonstrates
that the facts as observed by Jusino during the
approximately ten-second period from the point at which he
observed Bradley fall to the ground to the time he made his

---

[6] Defendant also relies on the testimony of both Judge Gesmer and Jusino
that a supervisory police officer instructed Jusino to arrest Bradley
to support the application of qualified immunity. However, any such
comment is irrelevant to the instant analysis since the instruction was
made after Jusino had already made the decision to arrest Bradley, and
therefore cannot be relied upon by Defendant in support of the
existence of arguable probable cause.

18

probable cause determination to arrest Bradley could not
have led a reasonable police officer to reasonably
determine that probable cause existed to arrest the
Plaintiff for either of violations described above.

The facts known to Jusino at the time of arrest
were limited to the following.  First, it is undisputed
that Jusino observed Bradley fall to the ground in front of
the police line, roll onto his stomach and place his hands
underneath his body.  According to Jusino, a reasonable
officer could have concluded from these observations that
Bradley was not sick or injured, given his ability to move
himself out of the way of the police line.  While it is
certainly true that "police officers are entitled to draw
reasonable inferences from the facts they possess at the
time of a seizure based upon their own experiences,"
Cerrone, 246 F.3d at 203, the reasonableness of such an
inference in these circumstances is questionable at best.
The fact that Bradley was able to roll over and protect his
limbs is proof of little more than an instinct to avoid
being crushed by a moving police line.  In any case, more
than Bradley's apparent "health" and his presence on the
ground were required for Jusino to make the objectively

19

reasonable determination that Bradley was committing an offense.

Defendant next contends that Plaintiff's failure to respond to Jusino's instruction to "get up" could give rise to the reasonable conclusion that Bradley was attempting to intentionally prevent the police line from proceeding. At the time Jusino gave his instruction, he knew nothing more about Bradley than that he had fallen to the ground and did not appear to be in distress. Bradley's failure to respond to Jusino's request, even if Jusino inferred from Bradley's silence that his failure to respond was intentional, is again insufficient to establish an objectively reasonable basis for probable cause.

To these limited facts known at the time of Bradley's arrest, Jusino adds the fact that Bradley's body first became "relaxed" as Jusino attempted to lift him up, and then became "tense" and "compacted." Defendant argues that taken together with Bradley's apparent health and his failure to respond to Jusino's instruction, a reasonable police officer could reasonably have concluded that Bradley was engaging in OGA or Disorderly Conduct.

20

Case 1:04-cv-08411-RWS  Document 149  Filed 05/04/09  Page 22 of 29

The facts known to Jusino at the time he arrested
Bradley fail to give rise to arguable probable cause.  It
is significant that from the time Bradley fell to the time
Jusino concluded that he had probable cause, only ten
seconds passed.  In such a brief period of time, and with
such limited facts available to Jusino with respect to
Bradley's presence on the sidewalk, the reason he fell, and
his level of distress, it was objectively unreasonable for
Jusino to believe that probable cause existed to arrest
Plaintiff.

As further evidence of the absence of arguable
probable cause, Plaintiff points to Jusino's failure to
make even the most minimal inquiry to determine whether
Bradley was in fact engaging in either Disorderly Conduct
or OGA.   Defendant disputes that Jusino had any such duty
to inquire.  The Court agrees with Plaintiff that under the
circumstances of this case, Defendant's failure to engage
in any inquiry precludes a finding that arguable probable
cause existed.

Many courts, including those in this Circuit,
have recognized that in certain circumstances, an arresting
officer is obligated to make a minimal inquiry before

21

making an arrest. See Jocks v. Tavernier, 316 F.3d 128,
135—36 (limiting Ricciuti v. N.Y. City Transit Auth., 124
F.3d 123 (2d Cir. 1997) in circumstances where an officer
"deliberately disregard[ed] facts known to him which
establish justification"); Kuehl v. Burtis, 173 F.3d 646,
650 (8th Cir. 1999) (recognizing officers' "duty to conduct
a reasonably thorough investigation prior to arresting a
suspect" in the absence of exigent circumstances); Merriman
v. Walton, 856 F.2d 1333, 1335 (9th Cir. 1988) ("Under
these circumstances, there is no probable cause. A
reasonable police officer would have made further inquiry
before effecting a warrantless arrest."); BeVier v. Hucal,
806 F.2d 123, 128 (7th Cir. 1986) (holding that an "officer
may not close her or his eyes to facts that would help
clarify the circumstances of an arrest"); see also Oliveira
v. Mayer, 23 F.3d 642, 647 (2d Cir. 1994) (citing with
approval BeVier's holding that "[r]easonable avenues of
investigation must be pursued [to establish probable cause]
especially when, as here, it is unclear whether a crime had
even taken place").

Defendant, however, objects that it is well-
established that an "arresting officer does not have to
prove plaintiff's version wrong before arresting him."

22

Curley v. Village of Suffern, 268 F.3d 65, 70 (2d Cir. 2001); Jocks, 316 F.3d at 135—36 (citing Ricciuti for holding that "probable cause to arrest should be determined based on what the officer knew at the time of the arrest," and that arresting officer has no duty to investigate exculpatory defenses offered by arrestee). But while "an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause," Panetta v. Crowley, 460 F.3d 388, 396 (2d Cir. 2006), it does not follow that a court cannot consider an officer's failure to make an inquiry in determining whether the officer's belief that probable cause existed was objectively reasonable.

The cases cited by Defendant are distinguishable from the facts presented here. As Defendant acknowledges, the circumstances under which the Court of Appeals has expressly disavowed any duty to investigate are those in which an officer effectuates an arrest based upon the statement of a complaining witness over the arrestee's protestations of innocence. See Panetta, 460 F.3d at 395— 96 (holding that where informant's information was sufficient to establish probable cause, an officer's failure to investigate protestations of innocence does not

23

"vitiate probable cause"); Curley, 268 F.3d at 70
(recognizing that where eyewitness account giving rise to
probable cause conflicts with arrestee's account, "the
arresting officer does not have to prove plaintiff's
version wrong before arresting him"); Maliha v. Faluotico,
286 F. App'x 742, 744 (2d Cir. 2008) (rejecting plaintiff's
argument that officer was required to "personally
investigate the incident" in light of "valid explanation
for [plaintiff's] actions").

Under the facts of this case, the duty to inquire
does not arise due to the existence of statements or
conflicting accounts of third-party witnesses. Here, in
contrast, Defendant was not in possession of any evidence,
such as a statement from a third-party witness, on which to
reasonably base his probable cause determination, and the
duty to inquire is not being invoked in order to require
officers to conduct "mini-investigations" before
determining whether probable cause exists.

Rather, it is only "[o]nce a police officer has a
reasonable basis for believing there is probable cause,
[that] he is not required to explore and eliminate every
theoretically plausible claim of innocence before making an

24

arrest." Ricciuti, 124 F.3d at 128. Without such a reasonable basis, an officer who makes an arrest is required to investigate until such a reasonable basis is established. Had Jusino inquired as to why Bradley had fallen or why he had not gotten up, Jusino may have been able to reasonably infer that Bradley was engaging in Disorderly Conduct or OGA. In the absence of such an inquiry, an objectively reasonable officer could not have reasonably concluded that he had probable cause to arrest Bradley.

### b. Bradley's Fourth Amendment Rights Were Violated

Having concluded that no arguable probable cause existed and Jusino's conduct was therefore not objectively reasonable with respect to qualified immunity, the Court turns to the remaining step in the qualified immunity analysis — whether the facts establish that Jusino's conduct violated Bradley's constitutional rights under the Fourth Amendment.

It is well-established that no constitutional violation occurred under the Fourth Amendment if Jusino had probable cause to arrest Bradley. See, e.g., Panetta, 460

F.3d at 395. "Probable cause exists 'when the arresting
officer has knowledge or reasonably trustworthy information
sufficient to warrant a person of reasonable caution in the
belief that an offense has been committed by the person to
be arrested.'" Lee v. Sandberg, 136 F.3d 94, 102—03 (2d
Cir. 1997) (internal quotation and citation omitted).
Although the "objective reasonableness component of the
inquiry as to lawfulness is not the same as the objective
reasonableness component of the inquiry as to qualified
immunity," Oliveira, 23 F.3d at 648, on the facts of this
case, the two inquiries effectively collapse into a single
analysis.

Because the Court finds, as a matter of law, that
Jusino lacked "arguable" probable cause to arrest Bradley,
it follows that he also lacked probable cause. Put
plainly, the same facts supporting the Court's
determination that no reasonable officer could have
reasonably concluded that probable cause existed lead to
the inexorable conclusion that Jusino lacked sufficient
knowledge on which to base a proper probable cause
determination. Since qualified immunity applies unless
"'no reasonably competent officer would have concluded
that' probable cause existed," Zellner, 494 F.3d at 367

(citation omitted), the Court's negative conclusion with
respect to arguable probable cause is determinative not
only of the qualified immunity analysis, but of Bradley's
affirmative false arrest claim as well.

Accordingly, the Court finds not only that
Defendant is not entitled to qualified immunity, but that
Plaintiff has established, as a matter of law, that he was
arrested without probable cause in violation of the Fourth
Amendment and is entitled to judgment as a matter of law on
his false arrest claim.

**Conclusion**

For the reasons set forth above, Plaintiff's
motion is granted, and Defendant's motion is denied.

Plaintiff shall submit judgment on notice. A
hearing on damages will be held on Monday, May 18, 2009, at
10:00 a.m., or such other time on which the parties agree,
unless the parties reach a settlement of the amount of
damages to be awarded Bradley. In the event the parties
reach an agreement on damages to be awarded to Bradley,

then a hearing will be held on attorneys' fees on May 18,

2009, or such other date agreed upon by the parties.


It is so ordered.


New York, N.Y.
May  4  , 2009

ROBERT W. SWEET
U.S.D.J.

28